AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Information associated with Three Target | ) | Case No.  MJ20-339 |
| Accounts/Identifiers, for Investigation of 21 | ) | |
| U.S.C. §§ 841 and 846 and Other Offenses | ) | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in the Western District of Washington, there is now concealed property and evidence described in Attachment B.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 90 days (give exact ending date if more than 30 days: October 24, 2020) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Ryan Smith, Special Agent, Drug Enforcement
Administration
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☐ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone/

Date: June 11, 2020

_____
*Judge's signature*

Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

City and state: Bellingham, Washington

USAO # 2020R00259

1
2

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

3      STATE OF WASHINGTON        )
4                                 )      ss
       COUNTY OF WHATCOM          )
5

6

7      I, Ryan Smith being first duly sworn, hereby depose and state as follows:

8      ## I.    INTRODUCTION

9      1.      I make this affidavit in support of an application for a search warrant under

10     Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information

11     about the location of the following three cellular telephones (collectively, the "Target

12     Telephones"):

13             a.      **Target Telephone 4 (TT4)**, assigned call number (206) 880-4341,
14     with listed subscriber "Jose Luis VALLE IBARRA" with an address of "19065 21st Ave
       NE, Lake Forest Park, Washington, 98155-2401," whose service provider is T-Mobile, a
15     wireless telephone service provider located at 4 Sylvan Way, Parsippany, New Jersey
16     07054.  Service began for **TT4** on March 30, 2020.  **TT4** is described herein and in
       Attachment A, and the location information to be seized is described herein and in
17     Attachment B.  Investigators believe that **TT4** is being used by Jose Luis IBARRA
18     VALLE to facilitate his drug trafficking activities.

19             b.      **Target Telephone 5 (TT5)**, assigned call number (425) 328-5534,
       with listed subscriber "Jesus Granica" with an address of "2118 168th Street SE, Bothell,
20     Washington, 98012-6056," whose service provider is T-Mobile, a wireless telephone
21     service provider located at 4 Sylvan Way, Parsippany, New Jersey 07054.  Service began
       for **TT5** on November 3, 2019.  **TT5** is described herein and in Attachment A, and the
22     location information to be seized is described herein and in Attachment B.  Investigators
23     believe that **TT5** is being used by Jesus GARNICA MELGOZA to facilitate drug
       trafficking activities.

24

25

26

27

28

1       c. **Target Telephone 6 (TT6)**, assigned call number (425) 626-8865,
2    with no listed subscriber or subscriber address, whose service provider is T-Mobile, a
wireless telephone service provider located at 4 Sylvan Way, Parsippany, New Jersey
3    07054. Service began for **TT6** on July 17, 2019. **TT6** is described herein and in
Attachment A, and the location information to be seized is described herein and in
4    Attachment B. Investigators believe that **TT6** is being used by an individual with the
5    alias name "PAISA" to facilitate drug trafficking activities.

6    ECPA

7       2. The Court has jurisdiction to issue the proposed warrant under the
8    Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is
9    a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the
10   Court is the Western District of Washington, a district court of the United States that has
11   jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

12   Pen Register Act

13      3. Because this warrant seeks the prospective collection of information that
14   falls within the statutory definitions of information collected by a "pen register" and/or
15   "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed
16   to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

17      4. The Court has jurisdiction to issue the requested pen-trap order because it is
18   a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2). Specifically, the Court
19   is a district court of the United States that "has jurisdiction over the offense being
20   investigated." 18 U.S.C. § 3127(2)(A)(i).

21      5. This application includes all the information required by the Pen Register
22   Act. *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1). Namely, Exhibit 1 to this application is a
23   certification from Assistant United States Attorney Nicholas Manheim that (1) identifies
24   the Drug Enforcement Administration as the law enforcement agency conducting the
25   investigation and (2) certifies the information likely to be obtained is relevant to an
26   ongoing criminal investigation being conducted by that agency. 18 U.S.C. § 3122(b).
27   The Assistant United States Attorney is an "attorney for the government" as defined in
28   Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 2
USAO #2020R00259

6. A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

7. In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls. Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers. The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act. Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

8. The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that T-Mobile and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service. Any entity providing such assistance shall be reasonably compensated by the Drug Enforcement Administration, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

9. This is the second application in this judicial district for a search warrant authorizing disclosure of the above information for Target Telephones 4 and 5 in connection with this investigation. This is first application in this judicial district for a

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 3
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

search warrant authorizing disclosure of the above information for Target Telephone 6 in connection with this investigation.

10.     **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

## II.     AGENT BACKGROUND

11.     I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7). Specifically, I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Bellingham, Washington Resident Office. In that capacity, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, *et seq*.). I have been employed as a Special Agent with the DEA since March 2017. Prior to becoming a Special Agent, I was a detective in the Special Victims Unit, a police motorcycle officer, and a police patrol officer with the Hoover Police Department in Hoover, Alabama. In my experience as a law enforcement officer, I have participated in numerous narcotics investigations, during the course of which I have participated in physical surveillance and executions of search warrants.

12.     I have completed the DEA Basic Agent Training Course as well as other training courses related to gangs and narcotics trafficking. I have participated in narcotics investigations at both the local and federal level, and I have participated in the execution of federal search warrants. As a result, I have become familiar with methods of operation of drug traffickers and organizations. As a Special Agent with the DEA, I have the responsibility of working with other federal and state law enforcement officers in investigations of violations of federal and state controlled substance laws, including the investigation of cocaine, methylenedioxymethamphetamine (MDMA), methamphetamine, heroin, fentanyl, marijuana, and other dangerous drugs.

13.     I have interviewed numerous drug dealers, drug users, and knowledgeable confidential informants about the lifestyles, appearances, and habits of drug dealers and

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 4
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  users.  I have become familiar with the manner in which narcotics traffickers smuggle,
2  package, transport, store, and distribute narcotics, as well as how they collect and launder
3  drug proceeds.  I am also familiar with the manner in which narcotics traffickers use
4  telephones, cellular telephone technology, internet, pagers, coded communications, slang-
5  filled conversations, false and fictitious identities, and other means to facilitate their
6  illegal activities and mislead law enforcement investigations.  I have had discussions with
7  other law enforcement personnel about the packaging and preparation of narcotics, the
8  methods of illegal narcotics traffickers, and the security measures that narcotics
9  traffickers often employ.  I have examined narcotics customers' supplier lists, pay/owe
10 ledgers maintained by traffickers, and other documentation related to narcotics
11 trafficking.  I have also examined documentation of various methods by which
12 methamphetamine, cocaine, marijuana, heroin, and other illicit drugs are smuggled,
13 transported, and distributed.  I have participated in hundreds of hours of surveillance of
14 narcotics traffickers.  During surveillance, I have personally observed narcotics
15 transactions, counter surveillance techniques, and the ways in which narcotics traffickers
16 conduct clandestine meetings.

17         14.    Through my participation as a case agent in Title III investigations, I have
18 gained knowledge and experience conducting investigations utilizing the interception of
19 wire and electronic communications. I have been involved with the review and decoding
20 of veiled intercepted conversations between narcotics traffickers that were subsequently
21 substantiated. Throughout my career in law enforcement, I have received training from,
22 worked with, spoken with, and gleaned knowledge from several experienced federal,
23 state, and local narcotics officers concerning the use of cell phones by drug traffickers to
24 facilitate drug trafficking activities.

25         15.    The facts in this affidavit come from my personal observations, my training
26 and experience, and information obtained from other agents and witnesses.  This affidavit
27 is intended to show merely that there is sufficient probable cause for the requested

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 5
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    warrant and pen-trap, and therefore does not set forth all of my knowledge about this

2    matter.

3         16.     Based on the facts set forth in this affidavit, there is probable cause to

4    believe that violations of Title 21, United States Code, Sections 841 and 846, have been

5    committed, are being committed, and will be committed by Jose Luis IBARRA VALLE,

6    Jesus GARNICA MELGOZA, and PAISA.  There is also probable cause to believe that

7    the location information described in Attachment B will constitute evidence of these

8    criminal violations, and will lead to the identification of individuals who are engaged in

9    the commission of these offenses.

10                   **III.**    **PROBABLE CAUSE**

11        **A.**    **The Investigation**

12         17.     The United States, including the Drug Enforcement Administration, is

13    conducting a criminal investigation of Jose Luis IBARRA VALLE, Jesus GARNICA

14    MELGOZA, "PAISA", and others, regarding possible violations of 21 U.S.C. 841(a)(1)

15    (distribution of controlled substances) and 846 (conspiracy to distribute controlled

16    substances).

17        **1.**    **Controlled Purchase from Jose Luis IBARRA VALLE in March 2020**

18         18.     In early 2020, a DEA confidential source (hereinafter "CS1") obtained,

19    from an associate in Mexico, the telephone number for an individual who would be able

20    to sell CS1 drugs. That telephone number was 503-607-9047 (IBARRA VALLE Phone

21    1). In summary, CS1 called the user of the IBARRA VALLE Phone 1, who was later

22    identified as Jose Luis IBARRA VALLE; IBARRA VALLE told CS1 that IBARRA

23    VALLE could provide CS1 a large quantity of methamphetamine.  During the week of

24    March 6, 2020, CS1 arranged, via telephone, for the purchase of one pound of

25    methamphetamine.

26         19.     CS1 is cooperating for financial compensation and immigration

27    consideration.  CS1 has prior convictions for illegal entry after deportation, most recently

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 6
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  in 2012, and a prior Washington State controlled substance violation in 2002. CS1 has
2  conducted numerous controlled purchases and is considered credible and reliable.

3      20.     On March 19, 2020, investigators met with CS1. CS1 made a consensually
4  recorded telephone call to IBARRA VALLE on IBARRA VALLE Phone 1 and arranged
5  to meet IBARRA VALLE in Lake Forest, Washington.[1] CS1 and CS1's vehicle were
6  searched for large amounts of US currency, weapons, and other contraband; none was
7  found. CS1 was provided a concealed recording device and $2,700 in pre-recorded buy
8  funds.

9      21.     CS1 told investigators that through prior phone calls (not recorded), he/she
10 and the user of IBARRA VALLE Phone 1, agreed on a purchase price of $2,500 for the
11 pound of methamphetamine. The additional $200 was paid by the CS to the individual in
12 Mexico who provided the CS IBARRA VALLE's phone number. The CS sent the $200
13 to Mexico via Sigue, a money remitter.

14     22.     Investigators followed CS1 to the arranged meeting location. CS1 did not
15 meet with anyone prior to the arrival of IBARRA VALLE. Investigators saw IBARRA
16 VALLE get into CS1's vehicle and noted that IBARRA VALLE arrived in a gray 2007
17 Nissan Altima (hereinafter "Target Vehicle 1" or "TV1"). Investigators later observed
18 that the Nissan Altima bore Washington license plate, BQY0420. According to the
19 Washington Department of Licensing, BQY0420 was the license plate number for a 2007
20 Nissan Altima registered to "ARMENDARIZ OLIVARES, SILVIA BELEM" at
21 6508 Northeast 181st Street, Kenmore, Washington 98028-4802. CS1 and IBARRA
22 VALLE met for a short amount of time in CS1's vehicle before investigators saw
23 IBARRA VALLE get out of CS1's vehicle, walk back to his Nissan (TV1), and leave the
24 area.

25

26

27 [1] All calls between CS1 and IBARRA VALLE prior to this call were not made in the presence of law enforcement
   and were not recorded; a review of tolls showed that CS1 had phone calls with IBARRA VALLE phone 1 prior to
28 March 19, 2020.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 7
USAO #2020R00259

23.     Investigators followed CS1 from the meeting location and again met with CS1.  CS1 did not meet with anyone between IBARRA VALLE leaving CS1's vehicle and the subsequent meeting with investigators.  CS1 and CS1's vehicle were searched for weapons, large quantities of US currency and other contraband; none was found.  Investigators recovered the suspected methamphetamine and the recording device from CS1.  The suspected methamphetamine weighed approximately 552.7 gross grams and field tested presumptive positive for the presence of methamphetamine.[2]

24.     CS1 told investigators that CS1 met with IBARRA VALLE, IBARRA VALLE provided CS1 with the methamphetamine, CS1 paid IBARRA VALLE with the pre-recorded buy funds, and IBARRA VALLE did not count the money.  CS1 stated that IBARRA VALLE also showed CS1 a small quantity of what CS1 was told, by IBARRA VALLE, was heroin.[3]  IBARRA VALLE also told CS1 that he had access to methamphetamine, heroin, and pills.  IBARRA VALLE told CS1 that the pills were "real."  Based on training and experience, investigators believe that IBARRA VALLE told CS1 that the pills were not counterfeit pills containing fentanyl but rather contained oxycodone.  CS1 also stated that IBARRA VALLE told CS1 that IBARRA VALLE had recently arrived in Washington and purchased his vehicle (TV1).  A Spanish speaking investigator listened to CS1's conversation with IBARRA VALLE as it was occurring.  The Spanish speaking investigator confirmed CS1's recounting of the meeting with IBARRA VALLE was accurate.

25.     A different investigator,[4] who is fluent in Spanish, provided a rough translation and transcription of the recorded Spanish-language conversation, and portions

---

[2] The methamphetamine weight included a Tupperware type container with attached tape that was used to seal the container.  Investigators have not received results from the lab regarding weight and composition of the suspected methamphetamine.
[3] IBARRA VALLE did not use the term "heroin,", but rather the coded Spanish words for "dirt/earth" and "brunette."
[4] This is a different Spanish speaking investigator than the one who listened to conversation between CS1 and IBARRA VALLE as it occurred.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   of that translation and transcription are included in the following paragraphs.[5] During the

2   Spanish-language conversation between CS1 and IBARRA VALLE, they said the

3   following:

4         **CS1:** How're we doing, cousin?

5         **IBARRA VALLE:** Really good, just here.

6         **CS1:** I was never able to understand what you were telling me about you having

7         some of the other stuff

8         **IBARRA VALLE:** I have earth/dirt… the brunette (heroin), I also have some of

9         the pills

10         **CS1:** Pills and brunette?

11         **IBARRA VALLE:** Yes

12         **CS1:** It's just that I didn't want to say much because I don't really like talking on

13         the phone, so I couldn't really understand what you were trying to tell me

14         **IBARRA VALLE:** Yeah, it's ok

15         **CS1:** Yeah, but the other guys were telling me that they were going to sell me

16         kilos

17         **IBARRA VALLE:** No, I only take out pounds, old man

18         **CS1:** Just pounds?

19         **IBARRA VALLE:** Yes. What do you think?

20         **CS1:** Can I see it really quick?

21         **IBARRA VALLE:** Yes, I have it right here

22         **CS1:** Look, I have a friend. The truth is, I wasn't going to get anything today,

23         because nobody wants to work.

24         26.     Based on training and experience, the Spanish-speaking investigator

25   listening to the conversation as it took place, and CS1statements, investigators believe

26   that in the above conversation IBARRA VALLE, offered and showed heroin to CS1.

27

28   [5] This individual provided all of the translations and transcriptions of Spanish-language communications provided in
  this Affidavit.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 9
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Investigators believe this took place when IBARRA VALLE said he had the "dirt/earth"

2  and the "brunette," which investigators know to be coded language for heroin.

3  Investigators also believe that IBARRA VALLE said he had pills and that he had pounds

4  of drugs as well.

5       27.    Later in the conversation, IBARRA VALLE and CS1 continued:

6      **IBARRA VALLE:** Hey can you do me the favor of getting some brunette or no?

7      **CS1:** I think, so. Is it good?

8      **IBARRA VALLE**: Yes

9      **CS:** And what price does that have?

10      **IBARRA VALLE:** Well, 700 the piece.  What do you think?

11      **CS1:** But that's…

12      **IBARRA VALLE:** It's good stuff

13      **CS1:** Well, with that thing, to know the price, one needs to see it, no? Because

14      some people put their hands on it and cut it up. And then other people put their

15      hands on it and cut it up.

16      **IBARRA VALLE:** I actually have a little bit of it here. It's good stuff. The truth,

17      it's really good, old man. We don't put anything in it. The only thing, it is a bit

18      mushed up because of the way they transport it, right?

19      **CS1:** But I…

20      **IBARRA VALLE:** I already told my brother to send it whole. To try to send it

21      whole. Because it's difficult to sell when it's mushed up like that. They refuse it.

22      **CS1:** Oh, ok. At 7?

23      **IBARRA VALLE:** Yes

24       28.    The recording of the conversation showed that IBARRA VALLE and CS1

25  continued talking. Later in the conversation, they had the following exchange:

26      **CS1:** How are the pills?

27      **IBARRA VALLE:** Well those I can give them to you at wholesale at about 12

28      **CS1**: 12?

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 10
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   **IBARRA VALLE**: Yes

2   **CS1**: It's a bit expensive, no? But they're replicas, right? Because the original

3   one's are expensive.

4   **IBARRA VALLE**: No, those are originals. Really. The 30's

5   **CS1**: That's what they say

6   **IBARRA VALLE**: No, really. Yeah old man, they are the badass ones. Even a

7   guy that I sold 100 to told me, holy shit these are the real thing. That's what he

8   told me. Because there are some that aren't good, they are...

9   **CS1**: They are imitation

10  **IBARRA VALLE**: Yes. But these are good, friend. And this stuff is also badass

11  **CS1**: Yeah, you can tell it's good

12  **IBARRA VALLE**: Yeah, it's good, the truth. Do me the favor to help me move

13  this stuff let's see if there is a way. This dirt/earth.

14  **CS1**: I do have a cousin, but he's always asked me for pills but I have never

15  wanted. I have asked him.

16  **IBARRA VALLE**: I'll take them to wherever you tell me to

17  **CS1**: He was telling me that he was getting them for 9, but they were fake

18  **IBARRA VALLE**: No, these are originals old man, the truth

19  **CS1**: But they told him that they were originals

20  **IBARRA VALLE**: And if not he can give them to someone to test them, because

21  that's what I did. To the guy I sold them to, he said lets go test them. And if they

22  aren't the good ones, there will be no deal. Well I told him, let's go.

23      29.     Based on training and experience, the Spanish-speaking investigator

24  listening to the conversation as it took place, and CS1statements, investigators believe

25  that in the above conversation IBARRA VALLE told CS1 that the price per ounce, or

26  "piece," of heroin is $700. Investigators also believe that when IBARRA VALLE told

27  CS1 that IBARRA VALLE had the real "30's." Investigators believe that IBARRRA

28  VALLE is referring to Oxycodone 30 milligram pills, "M30's", and that IBARRA

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 11
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

VALLE was saying that the pills are real, as opposed to imitation or counterfeit pills made with fentanyl. Investigators also believe that he could sell CS1 the pills for $12 per pill. Investigators know that the majority of M30's being sold on the illegal drug market are made with fentanyl.

30.    Later in the conversation IBARRA VALLE and CS1 continued:

**CS1:** With the pills I think I can find you a good customer

**IBARRA VALLE:** Do me the favor, I have a ton there, old man.

**CS1:** You can get lots?

**IBARRA VALLE:** I have about 10,000

**CS1:** Really?

**IBARRA VALLE:** Really

**CS1:** You have an urgency

**IBARRA VALLE:** I have lots of work but I don't have clients

**CS1:** That's bad, then

**IBARRA VALLE:** I have a shit ton of pounds, too

**CS1:** Well let things pass and I'll get some of everything

**IBARRA VALLE:** We have lots of this stuff, too

**CS1:** Let all this pass. With that other guy I was getting 10 kilos, that's 20 pounds

**IBARRA VALLE:** Yes, absolutely old man

**CS1:** That's why I want you to give me a good price

**IBARRA VALLE:** You're on, absolutely

31.    Based on training and experience, the Spanish-speaking investigator listening to the conversation as it took place, and CS1 statements, investigators believe that in the above conversation IBARRA VALLE said he had 10,000 pills, several pounds of drugs, but that he lacked customers

32.    Following the meeting with CS1, investigators followed IBARRA VALLE after he left the meeting location and as he drove around the area in TV1. As investigators followed IBARRA VALLE, they saw him driving in a manner consistent

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with conducting counter surveillance. Specifically, investigators observed IBARRA VALLE pull into a Park and Ride parking lot, turn around, and immediately reverse his original course of travel. Additionally, investigators observed IBARRA VALLE pull to the side of the road in Lake Forest, Washington. Shortly thereafter, investigators observed a male walk across the street and get into IBARRA VALLE's vehicle. The individual remained in IBARRA VALLE's car (TV1) for a short amount of time before investigators saw him get out and walk across the street, get into another car, and drive away. Based on training and experience, investigators believe that IBARRA VALLE conducted another drug transaction.

33.     Investigators followed IBARRA VALLE to 19065 21St Avenue Northeast, Lake Forest Park, Washington, which, as discussed below, investigators believe to be IBARRA VALLE's residence.[6] A short time later, investigators followed IBARRA VALLE from his suspected residence to a market in Shoreline, Washington. After IBARRA VALLE left the market, a King County Sheriff's deputy stopped the vehicle (TV1). Investigators reviewed IBARRA VALLE's Mexican voter registration card, which identified him by name, and released him.

**2.     Identification of TT4**

34.     On April 3, 2020—approximately two weeks after CS1's controlled buy with IBARRA VALLE—service for IBARRA VALLE Phone 1 ended. Investigators then identified a new phone number that they believe IBARRA VALLE uses. According to T-Mobile, on March 30, 2020, service was started on (206) 880-4341 (**TT4**) and is subscribed to "Jose Luis VALLE IBARRA" at "19065 21st Ave NE Lake Forest Park WA 98155-2401." As discussed above, investigators conducted a controlled purchase of methamphetamine from Jose Luis IBARRA VALLE and followed him to 19065 21st Avenue Northeast, Lake Forest, Washington on March 19, 2020.

---

[6] As is discussed above, and further below, investigators believe this to be IBARRA VALLE's residence because TT4 subscriber information, surveillance, and **TT4** location data places IBARRA VALLE at 19065 21st Avenue Northeast, Lake Forest Park, Washington.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 13
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.     A common call analysis was conducted between **TT4** and IBARRA VALLE Phone 1 that showed the two phones contacted approximately 40 of the same phone numbers.  Based on the subscriber information and the common call analysis, investigators believe that IBARRA VALLE is using **TT4** to further his drug trafficking activities.

**3.     Phone Tracker for TT4 and TT5**

36.     On April 15, 2020, United States Magistrate Judge Paula McCandlis signed a search warrant authorizing location tracking for **TT4** and **TT5**.  Subsequent review of tracker data for **TT4** shows that most nights **TT4** stays at 19065 21st Ave NE Lake Forest Park, Washington.  This is the same location as the subscriber address and the location to which investigators followed IBARRA VALLE following CS1's controlled purchase from IBARRA VALLE.  **TT4**'s tracker data and subscriber address, combined with surveillance, leads investigators to believe that IBARRA VALLE lives at 19065 21st Ave NE Lake Forest Park Washington.

**4.     Attempted UC purchase from IBARRA VALLE**

37.     On April 13, 2020, an undercover officer (UC1) began reaching out to IBARRA VALLE on **TT4,** via text message and phone call, in an attempt to purchase one pound of methamphetamine from IBARRA VALLE.  UC1 had a difficult time communicating with IBARRA VALLE as UC1 is primarily an English speaker and IBARRA VALLE seems to be primarily a Spanish speaker.  Given the language barrier and difficulties communicating between UC1 and IBARRA VALLE, investigators later used another undercover officer (UC2), who is fluent in Spanish, to speak to IBARRA VALLE.

38.     On April 13, 2020, UC1 had a Spanish-language text message conversation with **TT4**.  The following is a rough translation of that text message conversation:

1      **UC1:** What's up, I am Miguel's[7] friend el guero

2      **UC1:** Miguel gave me you number

3      **TT4:** What's been going on, friend

4      **TT4:** Call me

5      **UC1:** Do you speak English? My Spanish is really bad

6      39.    UC1 then received a call from **TT4** and UC1 had a recorded phone

7  conversation with IBARRA VALLE.[8] The following is a rough translation and

8  transcription of the call:

9      **TT4:** What's going on old man, how've you been?

10     **UC1:** Hey, really good, and you?

11     **TT4:** What's been up?

12     **UC1:** Do you speak English, cause my Spanish is really bad.

13     **TT4:** No, but which Miguel gave you the number? Which Miguel?

14     **UC1:** Miguel passed me your number

15     **TT4:** Which Miguel?

16     **UC1:** Well, Miguel from Shoreline. By the water.

17     **TT4:** Ok, very well

18     40.    The recorded call then ended because UC1 and IBARRA VALLE had a

19  difficult time communicating.  Law enforcement later compared a recording of IBARRA

20  VALLE's voice obtained during CS1's recorded controlled buy with IBARRA VALLE

21  and the recorded call between UC1 and IBARRA VALLE and believe it to be the same

22  person. UC1 then continued with the following text message conversation with IBARRA

23  VALLE on **TT4**[9]:

24

---

25  [7] Investigators provided IBARRA VALLE with fictitious information about "Miguel" throughout their conversations.  Investigators believe that IBARRA VALLE knows a person named Miguel, and used that name as
26  ruse in an attempt to gain IBARRA VALLE's trust.
     [8] This phone conversation occurred primarily in Spanish.
27  [9] This text message conversation occurred primarily in Spanish, although UC1 did at times use English words and it appears that IBARRA VALLE used a translation service, such as "Google Translate", to have some of the messages
28  translated into English.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 15
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     **UC1:** Are you alright?

2     **TT4:** Which Miguel gave you the number?

3     **UC1:** Everett

4     **TT4:** Where are you at.  How much do you need

5     **UC1:** Mt. Vernon. One of water

6     **UC1:** Later this week

7     **TT4:** Where are you? And how much do you need?

8     **UC1:** Mt Vernon. 1

9     **TT4:** I don't understand you

10     **UC1:** I live in Mt Vernon, I need one pound of water

11     **UC1:** Do you understand me?

12     **TT4:** A friend who speaks English is going to speak to you ahead, I don't know

13     what you're talking about.

14     **UC1:** Ok

15         41.    Based on training and experience, investigators believe that in the above

16 text message conversation, IBARRA VALLE asked UC1 where UC1 lived and what

17 quantity of drugs UC1 wanted.  UC1 asked IBARRA VALLE for "water," which is

18 coded language for methamphetamine, and told IBARRA VALLE that UC1 lived in the

19 Mount Vernon, Washington area.  Investigators believe that when the text message

20 saying "A friend who speaks English is going to speak to you ahead, I don't know what

21 you're talking about," meant that IBARRA VALLE would have an English-speaking

22 associate contact UC1.[10]

23         42.    Later on the same day, April, 13, 2020, UC1 received a phone call from an

24 unknown male, who identified himself as "PAISA." PAISA called from phone number

25 (425) 626-8865 ("**TT6**") and spoke English.  Subpoenaed T-Mobile records show this

26 phone is a prepaid phone with no listed subscriber name or subscriber address.  The

---

[10] Discussions about the meaning of IBARRA VALLE's responses of, "I don't understand you" and "...I don't know what you're talking about", are discussed below.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 16
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  following is a rough transcription of the recorded call between UC1 and "PAISA"; the

2  call was in English:

3      **UC1:** Hello

4      **PAISA:** Yeah, this is PAISA man, how are you?

5      **UC1:** Hey, what's going on?

6      **PAISA:** Not much

7      **UC1:** Well is your buddy the one that was texting me?

8      **PAISA:** Yeah, who's give you my number?

9      **UC1:** A, Miguel from Everett.

10      **PAISA:** Miguel?

11      **UC1:** Yeah

12      **PAISA:** What Miguel? Ponalero (Inaudible)?

13      **UC1:** No, that's all he told me, Miguel from Everett.

14      **PAISA:** From Everett?

15      **UC1:** Yeah, from Everett.

16      **PAISA:** So, where you are?

17      **UC1:** He said he met your buddy down there and he said that he was gonna tell

18      you that I was gonna call.  I live up in Mount Vernon.

19      **PAISA:** Mount Vernon?

20      **UC1:** Yeah, I need to buy the same thing as Miguel

21      **PAISA:** Oh, uh the same thing Miguel like have?

22      **UC1:** Yes, the same thing Miguel bought, that's what I need.

23      **PAISA:** Oh…so how much you wanted?

24      **UC1:** Oh, just one.

25      **PAISA:** Just one, one piece?

26      **UC1:** Yeah, just one piece for the first time

27      **PAISA:** Uh hu

28      **PAISA:** So where can I meet you? Or…

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    **UC1:** Does one piece, how much for the one piece.

2    **PAISA:** Um?

3    **UC1:** I live around Mount Vernon so

4    **PAISA:** You live in the Mount Vernon, you want me to go over there to Mount

5    Vernon?

6    **UC1:** Or we could meet in the middle.

7    **PAISA:** Uh…

8    **UC1:** Is it going to be today? Or in a couple days?

9    **PAISA:** So let me think a, um, no if you want today, I can go over there.

10    **UC1:** Well I'm working today, I'm, I'm farther up north. Um, I won't be back to

11    Mount Vernon till probably Wednesday or Thursday.

12    **PAISA:** Oh, ok.  Well, so you call me when you get ready, you know?

13    **UC1:** Yeah, you want me to call you or the other guy or text?

14    **PAISA:** Uh, just call me when you are ready.

15    **UC1:** Ok

16    **PAISA:** Alright

17    **UC1:** Sounds good, I'll give you a call.

18    **PAISA:** Ok then.

19    **UC1:** Ok, thanks bro, bye.

20    **PAISA:** Bye.

21    43.    In the above conversation, UC1 told PAISA that he/she wanted the same

22    thing as Miguel and wanted "one." UC1 again used the name Miguel to insinuate that

23    UC1 and, in this instance, PAISA, had the same mutual acquaintance and would therefore

24    make PAISA more likely to sell drugs to IBARRA VALLE.  Based on training and

25    experience, investigators believe PAISA's response of, "So how much you wanted?" and

26    "Just one, one piece?" was a question and then confirmation about the quantity of drugs

27    UC1 wanted to buy.  UC1's intention was to buy one pound of methamphetamine, but

28    law enforcement knows that "one piece" can also refer to heroin.  Investigators intended

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to buy methamphetamine as that was the drug purchased by CS1 in the controlled buy

2  with IBARRA VALLE, and it is unclear whether PAISA understood that UC1 was

3  looking to purchase methamphetamine; this may have a been a miscommunication

4  between UC1 and PAISA. Regardless, investigators believe PAISA made arrangements

5  to sell drugs to UC1.

6       44.    On the same day, after the phone conversation, UC1 and PAISA, using

7  **TT6**, had the following text message conversation in English:

8       **UC1:** Hey bro can I text you? Im at work, people around

9       **PAISA:** Ok

10       **UC1:** I told your friend I need one full one of water

11       **UC1:** How much

12       **UC1:** Can you help me out bro?

13       **PAISA:** The price for last 3200

14       **UC1:** I was looking for 2800

15       **PAISA:** The meaning of I can do it for 3

16       **UC1:** 3? Ok

17       **UC1:** Can u meet Thursday?

18       45.    Based on training and experience, investigators believe that in the above

19  conversation, UC1 asked for "one of water" and what the price would be. Law

20  enforcement knows "water" is coded language for methamphetamine.  Based on training

21  and experience, law enforcement believes that PAISA told UC1 the price for the last

22  pound of methamphetamine that PAISA sold (to an unknown party) was $3200, but after

23  negotiations, PAISA agreed to sell a pound of methamphetamine to UC1 for $3000.

24       46.    A review of **TT4**'s toll records shows that on April 13, 2020, **TT4** and **TT6**

25  were in contact approximately six times, the first starting at approximately 11:03 a.m.  Of

26  those six contacts, **TT4** had two outgoing phone calls, two outgoing text messages, and

27  two incoming phone calls.  The first contact between **TT4** and **TT6** that occurred at

28  approximately 11:03 a.m., was an approximately three minute voice call from **TT4** to

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 19
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**TT6**.  This first contact between **TT4** and **TT6** on April 13, 2020, occurred in the midst of the text message conversation between UC1 and IBARRA VALLE, wherein UC1 and IBARRA VALLE were having trouble communicating and arranging the deal. Investigators believe that is when IBARRA VALLE (**TT4**) called PAISA (**TT6**) to discuss PAISA reaching out and selling drugs to UC1.

47.     The next day—on April 14, 2020—UC1 and PAISA had the following text message conversation:

  **UC1**: ? Hey bro

  **PAISA**: What's up what's

  **UC1**: Waiting on you to text

  **PAISA**: Are you ready for Thursday

  **UC1**: Yes. U?

  **UC1**: I will be off early Thursday

48.     Over the next two days—on April 15, 2020 and April 16, 2020—UC1 had multiple recorded phone calls and text message conversations with PAISA discussing the meeting location and time for UC1 to meet PAISA to purchase drugs. In these communications, UC1 and PAISA agreed to meet near the Everett, Washington area.

49.     On April 16, 2020, following UC1's conversations with **TT6**, UC1 met with an individual who identified himself as PAISA, near Everett, Washington.  The person UC1 met with, PAISA, had the same sounding voice as the person who UC1 talked to on **TT6**.  Investigators therefore believe the user of **TT6** and the person UC1 met with, is the same person.  The following is a rough transcription of the recorded meeting between UC1 and PAISA:

  **UC1**: What's going on Bro?

  **PAISA**: Bueno, how are you man?

  **UC1**: Good, how are you, what's going on

  **PAISA**:  So, how you want to do this? I need to go and pick it up, you'll have to come with me

1   **UC1:** Come with you?

2   **PAISA:** Yeah

3   **UC1:** I thought you were going to bring it here?

4   **PAISA:** No

5   **PAISA:** It's a lot of shit man, lets go and grab it

6   **UC1:** Where is it?

7   **PAISA:** Two exits more

8   **UC1:** Two exits more? Well, I brought the money.

9   **PAISA:** Yeah, well, you can keep the money, then you can give me the money

10  when I go in there and then give it to you

11  **UC1:** Well, I dropped my friend off inside.

12  **PAISA:** In the store?

13  **UC1:** In the Home Depot so he could buy our stuff but I didn't want him here

14  while I did it so I got to wait for him.

15  **PAISA:** It's ok

16  **UC1:** Okay, well I, well I guess I'll call you as soon as he's done.

17  **PAISA:** Ok

18  **UC1:** Are you sure you don't have it?

19  **PAISA:** Yeah, I know, I know, you have the money.

20  **UC1:** I know buy you made me drive all the way down here.  And you don't have

21  it.

22  **PAISA:** I have it close to here.

23  **UC1:** Is it at a house or where?

24  **PAISA:** A yeah, at a motel

25  **UC1:** Yeah, I don't want to go to somebody's house. Somebody I don't know.

26  **PAISA:** No, you don't have to go in there. I can go in there and grab it,

27  and…[trails off, inaudible]

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 21
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**UC1:** Ok, well let me wait for my buddy, and if you're going to bring me to where a bunch of people are then I'm going to bring him

**PAISA:** No, no, there's not….there is only me and the other dude there's not a bunch of people there.

**UC1:** Ok, Ok, well, I guess, let me wait for my buddy and I'll call you right now

**PAISA:** Mmm, hmm, Ok man.

**UC1:** Alright.

50.     During the above meeting, UC1 had $3,000 in pre-recorded buy funds and showed the money to PAISA. During the conversation, UC1 learned from PAISA that PAISA did not have the one pound of methamphetamine as previously discussed.  UC1 understood from PAISA that PAISA needed to go pick up the methamphetamine at a motel nearby and that PAISA wanted UC1 to follow PAISA to go pick it up.  For officer safety reasons, UC1 did not travel with PAISA to pick up the methamphetamine.  UC1 made an excuse saying that UC1's friend was inside the Home Depot and that UC1 needed to wait for the friend before UC1 could leave the area.  UC1 later attempted to call and text message PAISA in order pick up the methamphetamine, but UC1 never received a response from PAISA.

51.     Based on training, experience, and the conversations between UC1 and IBARRA VALLE, investigators believe IBARRA VALLE used **TT4** to communicate with UC1 to arrange the sale of drugs.  Specifically, when IBARRA VALLE sent a text message asking, "where you at.  How much do you need" to the UC telephone, IBARRA VALLE was asking where UC1 was located and what quantity of drugs UC1 needed.  UC1 responded with a location (Mount Vernon, Washington) and commonly used code language for methamphetamine. IBARRA VALLE, however, indicated that he could not understand UC1.  Nevertheless, IBARRA VALLE sent a text message to the UC telephone saying that someone who spoke English would contact UC1.  UC1 later received a call from a male who identified himself as PAISA, using (425) 626-8865.  Through subsequent phone call conversations and text messages, UC1 arranged for the

1  purchase of a pound of methamphetamine for $3,000. Based on training, experience, and

2  these communications, investigators believe that IBARRA VALLE said an English-

3  speaking person would contact UC1, an English speaking person did contact UC1, and

4  that person arranged a drug deal with UC1. Investigators further believe that IBARRA

5  VALLE was trying to sell drugs to UC1 but, given the language barrier, it is possible

6  IBARRA VALLE decided to let UC1 buy from someone else, i.e., PAISA.

7      52.    Based on training and experience, investigators believe that when IBARRA

8  VALLE sent text messages to UC1 saying, "I don't understand you" and "…I don't know

9  what you're talking about" in response to UC1 twice asking for "water" and providing a

10  location (Mount Vernon, Washington), that IBARRA VALLE understood UC1 was

11  attempting to buy drugs but could not understand the rest of the conversation. This is

12  evidenced by IBARRA VALLE telling UC1 that "a friend who speaks English" is going

13  to talk to UC1, and UC1's subsequent drug conversations with "PAISA" and **TT4**'s toll

14  contacts with PAISA.

15      53.    The above facts combined with the toll record contacts between **TT4** and

16  **TT6** on April 13, 2020, UC1's communications with **TT6**, and UC1's meeting with

17  PAISA, investigators believe IBARRA VALLE used **TT4** to communicate to PAISA

18  (**TT6**) about PAISA selling drugs to UC1.

19      54.    UC1's meeting with PAISA lasted only a few minutes, and occurred around

20  12:00 p.m., on April 16, 2020. Shortly after PAISA left the meeting with UC1, UC1

21  started trying to communicate with PAISA at approximately 12:05 p.m. UC1 called **TT6**

22  multiple times and also sent multiple text messages to **TT6**, but received no response.

23  UC1 attempted to contact PAISA until approximately 1:58 p.m., on April 16, 2020. A

24  review of toll records for **TT4** shows that during the time that UC1 was unsuccessfully

25  attempting to contact PAISA on **TT6** (between 12:05 p.m., to 2:00 p.m.), that at

26  approximately 12:46 p.m., **TT4** (IBARRA VALLE) received a phone call from **TT6**

27  (PAISA) that lasted a little less than a minute. Based on the timing of the call, as well as

28  the following conversations, law enforcement suspect that IBARRA VALLE and PAISA

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 23
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  talked about UC1 and how they did not know UC1, or the fictitious person named
2  Miguel. PAISA's unfamiliarity with Miguel could be one of the reasons that PAISA
3  discontinued communications with UC1 following UC1 and PAISA's meeting.

4      55.     A review of toll records shows that **TT4** and **TT6** had a total of eleven
5  communications on April 16, 2020. The first communication was at 9:21 a.m., which
6  was before UC1 reached out to PAISA, and the last communication was at 6:25 p.m.,
7  several hours after PAISA stopped communicating with UC1.

8      56.     When investigators could not contact PAISA to complete the
9  methamphetamine purchase, UC1 and UC2 called IBARRA VALLE to have IBARRA
10 VALLE get PAISA to contact the UCs to sell them methamphetamine. The UCs called
11 IBARRA VALLE at 1:20 p.m. but the call went unanswered. The UC's then received a
12 text message from **TT4** at 1:21 p.m., and had a brief Spanish-language text message
13 conversation with TT4. The following is a rough translation of the text message
14 conversation between the UCs and **TT4**:

15     **TT4:** What's going on

16     **UCs:** Speak to my friend.  We are in Everett

17     **TT4:** Which friend

18     57.     In the above conversation, UC1 asked IBARRA VALLE to talk to UC2
19 with the intent of having UC2 assist with organizing and completing the purchase of
20 drugs.

21     58.     Then, at approximately 1:25 p.m., on April 16, 2020, UC2 had a recorded
22 Spanish-language conversation with IBARRA VALLE on **TT4**. Law enforcement
23 compared a recording of IBARRA VALLE's voice obtained during CS1's recorded
24 controlled buy with IBARRA VALLE and the recorded calls between the UCs (UC1 and
25 UC2) and believe it to be the same person. The following is a rough transcription and
26 translation of the recorded call:

27     **UC2:** Hello?

28     **TT4:** Tell me

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 24
USAO #2020R00259

1   **UC2:** Hello buddy, I'm right there with "el guero" [referring to UC1]. El guero is
2   my friend.  Your buddy isn't answering.
3   **TT4:** What buddy, old man?
4   **UC2:**  The one that speaks English, the paisa. We saw him here in Everett but he
5   said that he had to go get the stuff, but he's not answering. That he was going to
6   come back. Guero says that he showed Paisa the money and he said that he was
7   going to pick something up, but he hasn't called back.
8   **TT4:** Ok, I'll tell him to call you back.  Hey, but who are you, dude?  You're with
9   that dude?
10  **UC2:** Yeah, I was inside the store when he was here, but we drove to Everett, and
11  he's not answering.
12  **TT4:** But you're with that dude?
13  **UC2:** With my friend, El guero.
14  **TT4:** Oh, and where are you from, man?
15  **UC2:** What do you mean, where? From Mount Vernon.
16  **TT4:** No yeah, but where are you from, Mexican or what are you?
17  **UC2:** Oh, no from Michoacan
18  **TT4:** Michoacan
19  **UC2:** Yes. What's that?
20  **TT4:** What part of Michoacan are you from, dude?
21  **UC2:** Right there in Colima
22  **TT4:** No but, what, what, what?
23  **UC2:** Do you know Colima?
24  **TT4:** Yes, what part of Colima are you from?
25  **UC2:** Oh, I wasn't born there
26  **TT4:** No?
27  **UC2:** No.
28  **TT4:** And then?

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 25
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    **UC2:** How?

2    **TT4:** Do you know it or don't you?

3    **UC2:** Yes, yes.

4    **TT4:** What part do you know?

5    **UC2:** Right there by "Cobayana."

6    **TT4:** Oh, ok.  We'll call you back dude.  Hold on.

7    **UC2:** Ok, cause we're here waiting.

8    **TT4:** Alright then.

9    59.    Through training and experience, investigators believe that IBARRA

10 VALLE confirmed he knew PAISA when he said that he will have PAISA or himself call

11 the UCs (UC1 and UC2) back.  A few minutes later, at approximately 1:28 p.m., **TT4**

12 called the UC telephone. The following is a rough transcription and translation of the

13 Spanish-language conversation between UC2 and IBARRA VALLE:

14    **UC1:** Hello

15    **TT4:** Hey, where is your buddy at?

16    **UC2:** How're you?

17    **TT4:** Hey man

18    **UC2:** What's up?

19    **TT4:** Hey, ask this dude to explain to you really well who gave that dude the

20    number, because the truth, I don't know that Miguel guy, dude

21    **UC2:**  (UC2 to UC1)[11] He's asking who gave you his number

22    **UC1:** Miguel

23    **TT4:** But what Miguel?

24    **UC1:**  He told me he's from Everett but went back south, he told me to call you

25    directly. He said that he spoke to you and told you that I was going to call you.

26

27

---

[11] In this conversation, UC2 acted as translator for UC1.  The parentheses indicate the audio picked up by the

28 recording wherein UC2 asks UC1 questions in English that were posed by IBARRA VALLE in Spanish.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 26
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1     **UC2**: Hey, he said it was Miguel and he was in Everett, and he told my buddy

2     here to give you a call

3     **TT4**: But I don't know any Miguel, old man.

4     **UC2**: (UC2 to UC1) Do you know what he looks like?

5     **UC1**: Short, fat

6     **UC2**: He said that he's a short, kinda fat Mexican

7     **TT4**: Short and kind of fat?

8     **UC2**: Uh-huh

9     **TT4**: And is he bald, ask him if he's bald

10     **UC2**: (UC2 to UC1) Is he bald?

11     **UC1**: (UC1 to UC2) He had a hat on

12     **UC2**: No, he had a hat on. But that his name was Miguel and he lives in Everett

13     **UC1**: (UC1 to UC2) Tell him that I used to get if from him but he was too far

14     south, and you guys are a little further north

15     **TT4**: Short guy with a beard? Is he a short guy with a beard?

16     **UC2**: (UC2 to UC1) Does he have a beard?

17     **UC1**: (UC1 to UC2) Yeah

18     **UC2**: Yes, that he had a beard, short, and kind of fat.

19     **TT4**: Oh, I'll call him right now, tell him. Tell him not to get stressed; I'll call him

20     right now.

21     **UC2**: Ok

22     **UC2**: (UC2 to UC1) He's going to call him right now.

23         60.     Based on training and experience, law enforcement believe that in the

24 above conversation, IBARRA VALLE displayed continued concern about how the UCs

25 (UC1 and UC2) got his phone number. IBARRA VALLE expressed that he did not

26 know "Miguel"—the person whom UC1 had said provided IBARRA VALLE's phone

27 number during earlier conversations. These statements by IBARRA VALLE, including

28 IBARRA VALLE's mention of "Miguel", without being prompted by the UCs, combined

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

with the UCs calling from the same phone number, indicate that IBARRA VALLE knew UC1 to be the same person with whom IBARRA VALLE spoke on April 13, 2020, when UC1 was trying to arrange to buy drugs from IBARRA VALLE. Based on training and experience, investigators know that drug dealers are often suspicious and cautious when it comes to conducting drug sales with people they do not know, as the potential customer could be law enforcement or someone looking to rob the drug dealer. In this instance, investigators believe IBARRA VALLE was trying to verify that the UCs were safe to deal with so he would be more comfortable selling drugs to or arranging for someone else to sell drugs to the UC(s). Ultimately, investigators believe that IBARRA VALLE was satisfied with the UCs explanation of who "Miguel" was and that when IBARRA VALLE said, "Oh, I'll call him right now, tell him. Tell him not to get stressed; I'll call him right now" that IBARRA VALLE agreed to call PAISA for the UCs. According to toll records, IBARRA VALLE (**TT4**) did not immediately reach out to PAISA (**TT6**). According to toll records, the next contact between the **TT4** and **TT6** does not occur until approximately 2:00 p.m.; UC1 never spoke to PAISA again.

61.    At approximately 1:36 p.m., on the same day, UC1 and UC2 had another recorded phone call with IBARRA VALLE on **TT4**. The following is a rough translation and transcription of the recorded call:

**TT4**: Tell me cousin

**UC2**: What's up?

**TT4**: They're going to call you right now

**UC2**: They're going to call?

**TT4**: Yeah, don't get stressed, dude

**UC2 to UC1**: He said they're going to call, are you going to wait for them

**UC1 to UC2**: How long?

**UC2**: He's asking how long?

**TT4**: Tell him that I'm investigation who is the one who gave him the number. What car did that friend have?

1   **UC2 to UC1:** he's asking what car he was driving

2   **UC1 to UC2:** The guy today?

3   **TT4:** Miguel

4   **UC1 to UC2:** Today?

5   **UC2 to UC1:** No, the last time that you…

6   **UC2:** the last time that he saw him?

7   **TT4:** Yes

8   **UC2 to UC1:** Last time you saw him

9   **UC1 to UC2:** Jeep, I think. Red or Orange

10   **UC2:** He said orange or red. Jeep

11   **TT4:** Orange or red?

12   **UC2:** He doesn't know if the car he's driving is orange or red, but that it was a

13   Jeep

14   **UC1 to UC2:** I met him a couple of times

15   **TT4:** A Jeep?

16   **UC2:** Yeah, a jeep or something like that

17   **TT4:** Oh, ok. They are going to call you here, shortly

18   **UC2 to UC1:** He said that they are going to call you right now.

19   **UC1 to UC2:** Yeah but how much longer?

20   62.   In the above conversation, investigators believe that IBARRA VALLE

21   continued to display distrust and skepticism towards the UCs and how the UCs got **TT4.**

22   This is evident when IBARRA VALLE said he is investigating who provided the number

23   to UC1, followed by a number of questions about what "Miguel" looked like, and

24   questions about what kind of car he (Miguel) drove.  Ultimately, IBARRA VALLE said

25   that "they," indicating somebody, perhaps PAISA, would call the UCs.  As noted above,

26   PAISA and UC1 never spoke again but investigators did not know at the time that PAISA

27   would not be back in touch with UC1.  Based on training and experience, the UCs

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 29
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  understood IBARRA VALLE to mean that the person calling the UCs would be the
2  person selling drugs to the UCs.

3      63.    At approximately 1:50 p.m., approximately fifteen minutes following the
4  above conversation with IBARRA VALLE, the UCs had a Spanish-language text
5  message conversation with **TT4**.  The following is a rough translation of that text
6  message conversation:

7      **UCs:** We are taking off

8      **TT4:** They are going to call you

9      **UCs:** Ok

10      64.    After having not heard anything for approximately fifteen minutes, the UCs
11  sent a message to **TT4** saying they were leaving.  In response, IBARRA VALLE
12  indicated someone would call the UCs, and the UCs understood this conversation to
13  mean that IBARRA VALLE would have someone call the UCs to complete the drug
14  transaction.

15      65.    On the same day—between 2:08 p.m., and 2:18 p.m.—after the UCs
16  received no call from anyone, **TT4** and the UCs had a Spanish-language text
17  conversation.  The following is a rough translation of the text message conversation:

18      **TT4:** Did they call you

19      **UCs:** K

20      **UCs:** No

21      **UCs:** Nobody called, we already left

22      **TT4:** Excuse me, but we don't know you

23      **TT4:** We don't know a Miguel

24      66.    On the same day, at approximately 2:21 p.m., UC1 received a phone call
25  from (425) 247-3705, and the user identified himself as "Scottie."  Scottie spoke English,
26  and the phone call was recorded.  The following is a rough transcription of the
27  conversation between UC1 and Scottie:

28      **UC1:** Hello

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 30
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Scottie: Hello

2    **UC1:** Hello

3    **Scottie:** Hello. how you doing?

4    **UC1:** Hey, Good, who's this?

5    **Scottie:** Scottie, who's this?

6    **UC1:** Scottie?

7    **Scottie:** Yeah.

8    **UC1:** Scott, this is Gabriel.

9    **Scottie:** Who, Gabriel?

10    **UC1:** Yeah.

11    **Scottie:** Oh, Gabriel, yeah um…

12    **UC1:** What's going on?

13    **Scottie:** I was given this number by a mutual friend of ours.

14    **UC1:** Ok was it…

15    **Scottie:** He said you needed something?

16    **UC1:** Well yeah, we were supposed to meet up today but uh I don't know what's

17    going on.  Problem's on his end, not mine.

18    **Scottie:** Yeah, yeah, he gave me your number um I guess for us to handle it, I'm

19    not sure, um, yeah.

20    **UC1:** Well what'd he tell you?

21    **Scottie:** Uh, a pound.

22    **UC1:** Yeah, for… did he tell you a price?

23    **Scottie:** Um, no, uh… was that…night or day.

24    **UC1:** Oh ok, ah today, but the, what's that?

25    **Scottie:** No I mean is it for nighttime or daytime?

26    **UC1:** Uh for daytime, the, the uh water.

27    **Scottie:** Daytime, ok.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**UC1:** Yeah, we were supposed to, the problem is I'm already headed back up north because I don't know what the hell that guy's doing but I'm already, I'm already leaving.

**Scottie:** Oh ok, well where are at north are you? Uh, Mount Vernon?

**UC1:** Well I'm headed back to, yeah I'm headed back to the Mount Vernon-Burlington area.

**Scottie:** Ok, um well possibly bring it up to you, um, you know, so…

**UC1:** What's that?

**Scottie:** Um I possibly could bring it up to you so let me um touch base with him and I'll fuckin' call you back.

**UC1:** Ok, yeah call me.

**Scottie:** Yeah, we could bring it up to ya.

**UC1:** Ok, well call me and we'll see where we're at.

**Scottie:** Ok, bye.

67.     Based on training and experience, investigators believe that IBARRA VALLE had Scottie contact UC1 about buying drugs, however, as discussed further below, there are no toll records between Scottie and IBARRA VALLE. In the conversation described above, Scottie said that he had been contacted by a "mutual friend" and that he heard UC1 was looking for one pound. Scottie asked if UC1 needed "daytime" or "nighttime," to which UC1 responded he needed "daytime." Based on training and experience, investigators know "daytime" is coded language for methamphetamine and "nighttime" is coded language for heroin. Law enforcement believes that Scottie agreed to sell one pound of methamphetamine to UC1. As is explained further below, investigators believe IBARRA VALLE is the "mutual friend" who arranged for Scottie to call UC1 to sell UC1 a pound of either "daytime" or "nighttime;" Scottie agreed to sell the "daytime" to UC1.

68.     At approximately 2:39 p.m., after UC1's phone call with Scottie, UC1 received a phone call from IBARRA VALLE (**TT4**). UC1 and IBARRA VALLE had

the following phone conversation that occurred in English and Spanish; UC2 was not present when IBARRA VALLE called. The following is a rough translation and transcription of the recorded phone call:

**UC1** [in English]: Hello

**TT4** [in Spanish]: Hello

**UC1** [in English]: Hey

**TT4:** [in English] Hey, [in Spanish] what did he tell you?[12]

**UC1** [in English]: My friend is not here anymore

**TT4:** [in English] My friend, [in Spanish] where is he?[13]

**UC1** [in English]: My friend left

**TT4** [in Spanish]: Where?

**UC1** [in English]: Well, to the bar, I don't know

**TT4** [in Spanish]: Well, wasn't he with you?

**UC1:** [in English] No, a white guy, [in Spanish] the white, my Spanish is really bad. A white guy called me. You sent me to call.[14]

**TT4** [in Spanish]: But your friend?

**UC1:** [in Spanish] A white guy [in English] called me. Is he with you?[15]

**TT4:** [in English] Yes, [in Spanish] yes.[16]

**UC1** [in English]: Tell him to call me back because I already went north.[17]

**TT4:** Ok[18]

**UC1** [in English]: Ok, tell him to call me back, bye.[19]

69.     Investigators believe that in this call, IBARRA VALLE asked where UC2 was and UC1 said that UC2 had left.  UC1 then asked if IBARRA VALLE had told the

---

[12] After "Hey," the rest of the statement was spoken in Spanish.
[13] After "My friend," the rest of the statement was spoken in Spanish.
[14] After "No, a white guy," the rest of this statement was spoken in Spanish.
[15] "A white guy" was spoken in Spanish, and the rest of this statement was spoken in English.
[16] The first "yes" was spoken in English, and the second was spoken in Spanish.
[17] This was in English.
[18] This could be Spanish or English.
[19] This was in English.

1   "white guy" to call UC1.  IBARRA VALLE indicated that he did have the "white guy"

2   call UC1.  UC1 believes IBARRA VALLE understood the "white guy" to be Scottie as

3   Scottie did not have a Hispanic accent and PAISA appeared to be Hispanic and spoke

4   English with an accent common to native Spanish-speakers.

5     70. After the phone call, UC1 had a Spanish-language text message

6   conversation with **TT4**.  The following is a translation of that conversation:

7     **UC1:** A white guy called you

8     **UC1:** Do you know him?

9     **TT4:** Yes

10    **TT4:** Where is your friend? Wasn't he with you?

11    **UC1:** I left his house

12    71. Investigators believe that in this text message conversation, UC1 asked

13  IBARRA VALLE if he knew the "white guy" that called UC1.  IBARRA VALLE sent a

14  text message in reply and confirmed he did know the person who contacted UC1.  Based

15  on training and experience, investigators believe that IBARRA VALLE arranged for

16  Scottie to call UC1 so that Scottie could sell drugs to UC1.

17    72. Later the same day—between 3:10 p.m. and 4:04 p.m.—UC1 had the

18  following text conversation with (425) 247-3705, which was the number previously used

19  by Scottie:

20    **UC1:** What happened bro.  Thought u gonna call back

21    **Scottie:** Yeah sorry really busy it's super hot in Everett so heading north in a

22    minute

23    **Scottie:** I have one stop to make in Stanwood then I'm heading to you, and the

24    price is $3000

25    **UC1:** Im not paying 3 after they screwed up this morning.  I will order out from

26    somewhere else

27    **UC1:** Are u with them or separate?

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 34
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

73.     Investigators believe that in the above conversation, Scottie explained that he was heading towards UC1, he had a stop to make in Stanwood, and the price for the previously discussed one pound of methamphetamine was $3,000. UC1 then expressed frustration that the deal earlier in the day had not been completed and that UC1 was no longer willing to pay $3,000.  The conversation ended for that day, and no drug purchase took place.

74.     Two days later, on April 18, 2020, UC1 and Scottie had the following English-language text message conversation:

**UC1:** hey bro can u get me some this week?

**Scottie:** How much can you spend

**UC1:** as much as I need.  It wasn't price problem they mess up.

**UC1:** What is price for 1 daytime? 1 nighttime?

75.     In the above conversation, Scottie asked UC1 how much UC1 could spend, and UC1 indicated it was not about the money but that the other guys messed up.  Scottie stopped responding to UC1's text message and phone calls, and UC1's attempted purchase of methamphetamine was not completed.

76.     Based on training, experience, and these texts, investigators believe that IBARRA VALLE contacted Scottie, or had someone else contact Scottie, to arrange the sale of drugs to UC1. But, as mentioned above, there are no toll records connecting **TT4** to Scottie's number (425-247-3705).  As discussed further below investigators have not yet discovered how, or if, Scottie and IBARRA VALLE communicated directly.  Investigators believe that when Scottie mentioned their "mutual friend," he was referring to IBARRA VALLE, or perhaps an intermediary.  In addition, when IBARRA VALLE confirmed that he knew the "white guy," combined with Scottie's knowledge that UC1 needed 1 pound of drugs, further indicates to investigators that Scottie had been contacted by IBARRA VALLE, or an intermediary, after UC1 told IBARRA VALLE that PAISA did not come back with drugs.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 35
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

77.     The subscriber company for 425-247-3705 is called "Bandwith." According to Bandwith's website, "bandwith.com," Bandwith is a "Tier 1 nationwide all-IP voice network," which investigators understand to be an internet based phone company that allows users to make and receive phone calls over the internet. A subpoena return from Bandwith lists Scott GARTLAND as the subscriber name for 425-247-3705. A check with the Washington DOL shows one Scott GARTLAND in Washington State with a listed address of 410 4th Avenue, Seattle, Washington, 98104. NCIC shows that there is an individual named Scott GARTLAND who has criminal convictions in Washington State. According to NCIC, Scott GARTLAND has seven felony convictions. Three of the felony convictions are for controlled substance violations wherein GARTLAND was convicted in 2007, 2013, and 2019, respectively. GARTLAND also has felony convictions for forgery, financial fraud, second degree burglary, and taking a motor vehicle without permission. All of these convictions occurred before 2007; GARTLAND has several misdemeanor convictions as well. Based on training and experience, given the similar name, Scottie and Scott, investigators suspect that Scottie could be Scott GARTLAND.

78.     A review of IBARRA VALLE's toll records during his conversations with UC1 about Scottie shows that IBARRA VALLE had several communications with 206-430-4200, a T-Mobile phone subscribed to Humberto J. GARCIA at 2608 Center Road, Everett, Washington. NCIC shows that there is an individual named Humberto GARCIA who has criminal convictions in Washington State. According to NCIC, in Washington alone, GARCIA has seven felony convictions, three of which are controlled substance violations. GARCIA was convicted of the three controlled substance felonies in March, April, and May 2018. The other Washington felonies include possession of a stolen vehicle, bail jumping, and theft of a motor vehicle, all occurring in or before 2018. GARCIA also has multiple misdemeanor convictions. NCIC also shows that GARCIA also has misdemeanor convictions in Florida and Alaska.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 36
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

79.     A review of toll records shows that phone number 206-798-8559, with a subscriber name of Brian McLaren and a subscriber address of 410 4th Avenue, Seattle, Washington, 98104—the same address to which "Scottie"'s phone was registered—was in contact with IBARRA VALLE Phone 1 in March 2020, and had approximately 27 contacts. A check with Washington DOL has a listed address for Brian McLaren of 410 4th Avenue, Seattle, Washington, 98104; the same listed address as Scott GARTLAND. NCIC shows that there is an individual named Brian McLaren who has criminal convictions in Washington State. According to NCIC, Brian McLaren has four felony convictions from 2014 for stolen property, burglary, possession of a stolen firearm, and unlawful possession of a firearm; McLaren has no listed misdemeanors. A review of toll records shows that between April 20, 2020 and May 19, 2020, phone number 206-798-8559 (McLaren) was also in contact with Humberto J. GARCIA phone number 206-430-4200, approximately 103 times.

80.     Based on training and experience and Washington DOL records, investigators suspect that Scottie, who investigators suspect could be Scott GARTLAND, who shares a listed address with Brian McLaren, is connected to Brian McLaren. Through tolls, 206-798-8559, a phone subscribed to McLaren, was in contact with 206-430-4200, a phone subscribed to Humberto J. GARCIA, who was/is in contact with **TT4**. Investigators suspect through these people, IBARRA VALLE arranged for UC1 to buy drugs from Scott.

81.     In sum, investigators believe that IBARRA VALLE used **TT4** to arrange drug purchases with UC1, UC2, PAISA (**TT6**), and Scottie.

**5.     Surveillance of IBARRA VALLE on May 14, 2020**

82.     On May 14, 2020, law enforcement established surveillance in the area of IBARRA VALLE's residence at approximately 9:00 a.m. After establishing surveillance, investigators noticed that the vehicle IBARRA VALLE had previously been seen in was not at the residence. A review of **TT4**'s location data showed that **TT4** was at or near 16540 NE 143rd Street, Woodinville, Washington. Investigators also reviewed

pole camera footage at 19065 21st Avenue Northeast, Lake Forest, Washington (IBARRA VALLE's residence) and saw a vehicle, similar in appearance to the Nissan investigators previously saw IBARRA VALLE driving, leave the area of IBARRA VALLE's residence at about the same time **TT4's** tracker data left the house.  Law enforcement then established surveillance at 16540 NE 143rd Street, Woodinville, and saw that there was a truck at the residence bearing Washington State license plate B40950S.  A check with the Washington department of licensing shows that the truck is registered to "Casa Bonita" at 8315 216th Street, Southeast, Woodinville, Washington.  The truck displayed a company logo or advertisement for the Casa Bonita company, and a listed web address of www.casabonita.com.  A search of the company's website listed the company's address as 8315 216th Street, Southeast, Woodinville, Washington, as well.  Investigators did not see IBARRA VALLE's vehicle at the residence.

83.    Law enforcement stayed in the area and monitored location data for **TT4** for several hours.  In the afternoon, investigators saw the "Casa Bonita" truck leave the area and drive north on State Route 9 towards Lake Stevens, Washington.  While driving to Lake Stevens, Washington, investigators saw that **TT4's** pings were in approximately the same area as the truck.  While following the truck, the truck stopped at a store in Woodinville, Washington.  When the truck left the store, law enforcement saw an individual in the front passenger seat who was later identified as IBARRA VALLE.  The truck eventually stopped at a house on the corner of 16th Street Southeast, and 83rd Avenue Southeast, Lake Stevens, Washington.  Investigators continued surveillance and later saw IBARRA VALLE working at the residence and that it was the same person who law enforcement earlier saw in the front passenger seat of the truck.  A review of the phone tracker data indicated **TT4** was at the same location as IBARRA VALLE.  With **TT4's** location data mirroring IBARRA VALLE's location, first at one site, then later at another, law enforcement believes that, based on training and experience, this further shows IBARRA VALLE is the user of **TT4**.  Also, based on training and experience,

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 38
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  drug dealers often have legitimate jobs that help deflect suspicion about their illegal
2  sources of income.

3  **6.    Toll Analysis of TT4 and TT5**

4    84.    A review of TT4's tolls shows that between March 31, 2020, and May 27,
5  2020, **TT4** and **TT5** (Jesus GARNICA MELGOZA) were in contact approximately 295
6  times; **TT5** is TT4's fifth most frequent contact. According to T-Mobile records, 425-
7  318-5534 (**TARGET TELEPHONE 5**) is subscribed to "Jesus Granica" with an
8  activation date of November 3, 2019 with an address of "2118 168TH ST SE BOTHELL
9  WA 98012-6056." A search of the Washington Department of Licensing records shows a
10 Washington driver's license in the name of Jesus MELGOZA GARNICA at the 168th
11 Street Southeast address and multiple vehicles registered to Jesus MELGOZA
12 GARNICA and Jesus GARNICA MELGOZA at the same address.

13   85.    Investigators believe that Jesus MELGOZA GARNICA and Jesus
14 GARNICA MELGOZA are the same person and the user of **TARGET TELEPHONE 5**.
15 According to an NCIC search using the name Jesus GARNICA MELGOZA and his
16 Washington DOL date of birth, two individuals have used the name Jesus GARNICA
17 MELGOZA and the listed date of birth. Without fingerprinting one of the individuals,
18 investigators are at this time unable to determine which criminal history belongs to this
19 Jesus GARNICA MELGOZA. One of the criminal histories has convictions that include
20 controlled substances violations, driving violations, and making false statements. The
21 other criminal history has convictions that include assault, theft, and a driving violation.[20]
22 Based on training and experience, drug dealers who are not indicted, arrested, and
23 convicted, often continue in their drug trafficking activities for extended periods of time;
24 it would not be unusual for a drug trafficker to continue selling drugs for several years
25 without the intervention of law enforcement. Further, investigators believe that Jesus

26
27 [20] In a previous sworn affidavit for **TT4** and **TT5**, only the criminal history for Jesus GARNICA MELGOZA that included the controlled substance violation was mentioned. Upon further review, a separate criminal history for Jesus GARNICA MELGOZA without controlled substance violations was discovered; that criminal history was not
28 included in the prior affidavit but is included here.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 39
USAO #2020R00259

1    GARNICA MELGOZA is the same individual who is using **TT5** and communicating

2    regularly with IBARRA VALLE on **TT4**.

3        86.    According to toll records for **TT5**, IBARRA VALLE's Phone 1 was

4    approximately the third most frequent contact of GARNICA MELGOZA's **TT5** between

5    February 15, 2020 and June 3, 2020 . According to toll records for **TT5**, **TT4** is the

6    fourth most frequent contact of GARNICA MELGOZA's **TT5**. Based on the toll records,

7    GARNICA MELGOZA's criminal history and some of the individuals that GARNICA

8    MELGOZA is suspected to be in contact with, discussed further below, investigators

9    believe GARNICA MELGOZA is a drug trafficking associate of IBARRA VALLE.

10        87.    Below is a small selection of individuals that GARNICA MELGOZA's

11    **TARGET TELEPHONE 5** is in contact with:

12        a.    425-315-4663 – According to AT&T records, the listed user is
Austin W. HAMMOND.  HAMMOND had 154 contacts with GARNICA

13    MELGOZA between February 22, 2020, and May 26, 2020.  According to NCIC,

14    HAMMOND has a 2011 Washington State conviction for a controlled substance
violation.

15

16        b.    425-273-4314 – According to T-Mobile records, this phone is
subscribed to Eric WILLIAMS and had 21 contacts with GARNICA MELGOZA

17    between March 6, 2020, and May 31, 2020; the majority were in March 2020, with

18    one contact in May 2020.  According to NCIC, WILLIAMS has a 2014 conviction
for a controlled substance violation.

19

20        c.    425-426-8887 – According to AT&T records, this phone is
subscribed to Jay PETERSON and had 118 contacts with GARNICA MELGOZA

21    between February 17, 2020, and March 22, 2020.  According to NCIC,

22    PETERSON has a 2002 conviction for a controlled substance violation.

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         d.     425-244-3018 – According to Sprint records, this phone is subscribed to Carrie Burleson.  Based on a law enforcement database query,

2  investigators suspect this phone is used by Jennifer Marie FITZGERALD. FITZGERALD had 742 contacts with GARNICA MELGOZA between February

3  15, 2020, and May 26, 2020.  According to NCIC, FITZGERALD has 2007 and

4  2012 convictions for controlled substance violations.

5      **7.**    **Analysis of TT4 and TT5 Location Information**

6      88.    As noted above, this is the second application for search warrants for

7  location information in this case for **TT4** and **TT5**.  On April 15, 2020, United States

8  Western District of Washington Magistrate Judge Paula L. McCandlis granted a search

9  warrant for prospective location information for both phones.  In response to the search

10  warrants for **TT4** and **TT5**, T-Mobile provided location information for both phones

11  approximately every 15 minutes.  Based on my training and experience, this is the

12  standard way in which T-Mobile provides cell phone GPS location information.

13  Investigators receive location information from T-Mobile in the form of longitude and

14  latitude coordinates, with an accompanying estimation of the accuracy of those

15  coordinates.  The accuracy estimation provides information indicating the approximate

16  possible distance of the phone from the provided latitude and longitude coordinates; the

17  distance is provided in meters.  In other words, T-Mobile provides the coordinates as well

18  as information indicating how near or far the phone could be from those coordinates as

19  measured in meters.

20      89.    In regards to **TT5,** the accuracy of the provided coordinates has often been

21  within 100 meters, meaning the phones are within 100 meters of the coordinates provided

22  by T-Mobile.  Location information for **TT4** is often accurate, as displayed when

23  investigators located and further identified IBARRA VALLE as the user of **TT4**

24  described above.  However, it appears that when **TT4** is in the area of IBARRA

25  VALLE's residence, 19065 21st Avenue Northeast, Lake Forest Park, Washington, that

26  the accuracy distance of **TT4** often exceeds 1000 meters.  The consistency of the less

27  accurate pings when investigators believe IBARRA VALLA is at his residence, 19065

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 41
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   21st Avenue Northeast, Lake Forest Park, Washington, leads investigators to believe that
2   when they receive less accurate location information around his residence, that **TT4** is at
3   the residence.[21] Also, investigators have seen that the times at which T-Mobile provides
4   location information for **TT4** and **TT5** are asynchronous so investigators do not receive
5   location information for **TT4** and **TT5** at the same time, making it difficult to determine
6   if and when the phones come together.

7           90.     A review of the location information collected for **TT4** and **TT5** since
8   April 15 shows that on April 17, April 21, May 28, and June 1, 2020, **TT4** and **TT5** were
9   in close proximity to one another.  On April 17, 2020, around approximately 7:30 a.m,
10  investigators twice received location information from T-Mobile for **TT5** that, when
11  searched via Google Maps, indicated **TT5** was within a quarter mile of the intersection of
12  Ballinger Way (aka State Highway 104) and 15th Avenue Northeast, Lake Forest Park,
13  Washington.[22] The intersection is less than a mile from IBARRA VALLE's residence at
14  19065 21st Avenue Northeast, Lake Forest Park, Washington.  Around the same time,
15  location information provided by T-Mobile for **TT4** indicated that IBARRA VALLE was
16  in the area of his residence.  While the location information data does not show the
17  phones were right next to one another, it does show they were both within a mile of each
18  other.  Also of note is that this intersection this also less than a mile from the area where
19  CS1 conducted the controlled purchase from IBARRA VALLE.  Based on training and
20  experience, law enforcement believes that it is possible that IBARRA VALLE and
21  GARNICA MELGOZA met at some point during the time when the phones were close to
22  one another.

23
24
25  [21] As described above, on May 14, 2020, investigators observed via pole camera a car similar in appearance to the
26  one IBARRA VALLE was seen driving during CS1's controlled purchase, leave 19065 21st Avenue Northeast, Lake
    Forest Park, Washington, The location information prior to the suspected IBARRA VALLE vehicle leaving the
27  residence varied between a few hundred meters and over a thousand meters. Thus, law enforcement believes this is
    an example of the inaccuracy of the location information when **TT4** is at IBARRA VALLE's residence.
28  [22] Investigators are unsure why location data was sent twice around this time as it appears to be an anomaly.

91.     On April 21, 2020, between approximately 5:20 and 6:20 p.m., investigators received location information from T-Mobile for **TT5** that, when searched via Google Maps, indicated **TT5** was within a quarter mile of the intersection of Ballinger Way (aka State Highway 104) and 15th Avenue Northeast, Lake Forest Park, Washington.  As noted above, the intersection is less than a mile from IBARRA VALLE's residence.  Around the same time, location information for **TT4** provided by T-Mobile indicated that IBARRA VALLE was in the area of his residence.  While the location information data does not show the phones were right next to one another, it does show they were both within a mile of each other.  Based on training and experience, law enforcement believes that it is possible that IBARRA VALLE and GARNICA MELGOZA met at some point during the time when the phones were close to one another.

92.     On May 28, 2020, between approximately 6:00 p.m., and 10:00 p.m., investigators received location information from T-Mobile for **TT4** and **TT5**, indicating that the phones were again within one mile of each other for approximately four hours. Earlier in the evening, after 6:00 p.m., the phones were on the West side of Interstate 5, along State Highway 104.  Later that evening, before 10:00p.m., the phones were both on the East side of Interstate 5, along Ballinger Way (aka State Highway 104).  Based on training and experience, law enforcement believes that it is possible that IBARRA VALLE and GARNICA MELGOZA met at some point during the time when the phones were close to one another.

93.     On June 1, 2020, at approximately 8:50 a.m., investigator received location information from T-Mobile for **TT5** that, when searched via Google Maps, indicated **TT5** was within a quarter mile of the intersection at Ballinger Way and 15th Avenue Northeast, Lake Forest Park, Washington.  As noted elsewhere, this intersection is less than a mile away from IBARA VALLE's residence.  At approximately the same time, location information provided by T-Mobile for **TT4** indicated **TT4** was in the area of IBARRA VALLE's residence.  Based on training and experience, law enforcement

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 43
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  believes that it is possible that IBARRA VALLE and GARNICA MELGOZA met at
2  some point during the time when the phones were close to one another.

3      94.    As described above, T-Mobile usually only provides location information
4  approximately every 15 minutes. Based on training and experience, law enforcement
5  knows that it is possible that Jesus GARNICA MELGOZA and IBARRA VALLE met,
6  and parted ways, between one of the approximate 15 minute intervals in which location
7  information was not provided. Further, given the sometimes less precise location
8  information provided by T-Mobile, it is also possible the that when **TT4** and **TT5** are in a
9  somewhat similar location, that their users are actually meeting even though the location
10 information does not show the phones are right next to one another. At this time,
11 investigators are not aware of any legitimate reason why GARNICA MELGOZA would
12 be in the areas near IBARRA VALLE's residence.

13     95.    A review of toll and pen register/trap and trace data shows that **TT4** and
14 **TT5** were in contact approximately fifteen times on April 17, and approximately twice on
15 April 21, 2020, which are the first two occasions the phones were in close proximity to
16 one another. However, **TT4** and **TT5** were not in contact on May 28, or June 1, 2020,
17 the other two occasions the phones were in close proximity to one another. Of note is
18 that **TT4** and **TT5** were in contact approximately five times on May 27, 2020, and
19 approximately 32 times on May 31, 2020. May 27 and May 31, 2020, are one day prior to
20 the third and fourth occasions that **TT4** and **TT5** were in close proximity to one another,
21 respectively. Based on training and experience, investigators suspect that when **TT4** and
22 **TT5** were in close proximity to one another that it is possible IBARRA VALLE and
23 Jesus GARNICA MELGOZA met with one another. While the phones were in contact
24 on the first two days of the possible meetings, possibly communicating about the meeting
25 location, the phones were not in contact the second two occasions. However, as outlined
26 above, **TT4** and **TT5** were in contact the days prior to the third and fourth potential
27 meetings, and law enforcement suspect they could have arranged the possible third and
28 fourth meetings a day in advance.

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 44
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

96.     The investigation shows that IBARRA VALLE is a likely drug dealer, that Jesus GARNICA MELOGZA in in frequent contact with and possibly meeting with IBARRA VALLE, and that Jesus GARNICA MELGOZA is in frequent contact with others who have past criminal convictions for controlled substance violations. Based on this information, training, and experience, investigators suspect that Jesus GARNICA MELGOZA is involved in drug trafficking and uses **TT5** to further his possible drug trafficking activities.

**8.     Toll analysis of TT4 and TT6**

97.     A review of **TT4**'s toll records shows that between April 3, 2020, and May 26, 2020, **TT4** and **TT6** were in contact approximately 120 times; **TT6** is **TT4**'s 17th most frequent caller.  As detailed above, investigators believe PAISA and IBARRA VALLE are communicating using **TT6** and **TT4** respectively, to further their drug trafficking activities.  Specifically law enforcement suspect this occurred when UC1 was arranging and attempting to purchase drugs from IBARRA VALLE and then later, PAISA, on April 13 and April 16, 2020.

98.     Based on the facts detailed in this affidavit, I believe that **TT4, TT5,** and **TT6** are being used in furtherance of drug trafficking activities.

**IV.     KNOWLEDGE BASED ON TRAINING AND EXPEREINCE**

99.     Based on my training, experience, and conversations with other experienced narcotics investigators, I have gained experience in the techniques and methods used by drug traffickers to distribute controlled substances, to include their use of cellular phones and other electronic communication devices to facilitate their trafficking activity.  I know drug traffickers use cellular phones to communicate with suppliers, re-distributors, and customers.  These communications via cellular phone often include discussing details around drug deals such as time and place of drug transactions, types of drugs, amounts of drugs, methods of payment for drugs, and quality of drugs sold or bought, amongst other things.  I know that it is common for drug traffickers to use multiple phones as well as change phone numbers regularly.  They use different

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 45
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   telephones to help compartmentalize their drug trafficking activities. This might entail
2   using specific phones for their personal life and other phones for drug activity. Or it
3   might include using different phones for different individuals or aspects of their business,
4   such as using certain phones to contact suppliers and other phones to contact
5   redistributors.  This compartmentalizing is especially common for individuals in
6   leadership positions. Drug traffickers often try to keep the various components and
7   organization members separate to protect parts of the organization from detection by law
8   enforcement.  For example, if one individual or arm of a drug trafficking organization
9   (DTO) is arrested or seeks to assist law enforcement, that person could do less damage to
10  the organization if the leadership limits what he or she knows about other parts of the
11  DTO.  Drug traffickers also use multiple cell phones to frustrate law enforcement
12  interception and monitoring.  Where there are multiple cell phones, law enforcement may
13  learn of one part of the organization's activities by intercepting one phone, but they
14  would not receive information as to the overall activities of the DTO.  Thus, the use of
15  multiple cell phones helps the survival of the overall organization.

16      100.   Based on my training and experience, I know each cellular device has one
17  or more unique identifiers embedded inside it.  Depending on the cellular network and
18  the device, the embedded unique identifiers for a cellular device could take several
19  different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic
20  Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber
21  Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network
22  Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an
23  International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as
24  transmitted from a cellular device to a cellular antenna or tower -- can be recorded by
25  pen-traps and indicate the identity of the cellular device making the communication
26  without revealing the communication's content.

27      101.   Based on my training and experience, I know that when a cell phone
28  connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 46
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  cellular antenna or tower, and the cellular antenna or tower records those identifiers as a
2  matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular
3  antenna or tower -- are like the telephone number of an incoming call.  They can be
4  recorded by pen-trap devices and indicate the identity of the cell phone device making the
5  communication without revealing the communication's content.  In addition, a list of
6  incoming and outgoing telephone numbers is generated when a cell phone is used to
7  make or receive calls, or to send or receive text messages (which may include
8  photographs, videos, and other data). These telephone numbers can be recorded by pen-
9  trap devices and then used to identify the parties to a communication without revealing
10  the communication's contents.

11    102.    Based my training and experience, I know that a cell phone can also be
12  used to exchange text messages with email accounts.  The email addresses associated
13  with those text messages can be recorded by pen-trap devices and then used to identify
14  parties to a communication without revealing the communication's contents.

15    103.    Based on my training and experience, I know that cellular phones can
16  connect to the internet via a cellular network.  When connecting through a cellular
17  network, internet communications sent and received by the cellular phone each contain
18  the same unique identifier that identifies cellular voice communications, such as an ESN,
19  MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular
20  phone also contain the IP address associated with that cellular phone at the time of the
21  communication.  Each of these unique identifiers can be used to identify parties to a
22  communication without revealing the communication's contents.

23    104.    In my training and experience, I have learned that T-Mobile is a company
24  that provides cellular telephone access to the general public.  I also know that certain
25  providers of cellular telephone service have technical capabilities that allow them to
26  collect and generate information about the locations of the cellular telephones to which
27  they provide service, including E-911 Phase II data (also known as GPS data or latitude-
28  longitude data) and cell-site data (also known as "tower/face information" or cell

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 47
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  tower/sector records). E-911 Phase II data provides relatively precise location
2  information about the cellular telephone itself, either via GPS tracking technology built
3  into the phone or by triangulating on the device's signal using data from several of the
4  provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers
5  covering specific geographic areas) that received a radio signal from the cellular
6  telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the
7  telephone connected. These towers are often a half-mile or more apart, even in urban
8  areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to
9  a wireless device does not necessarily serve every call made to or from that device.
10  Accordingly, cell-site data is typically less precise that E-911 Phase II data.
11       105.    Based on my training and experience, I know that T-Mobile can collect E-
12  911 Phase II data about the location of the Target Cell Phone, including by initiating a
13  signal to determine the location of the Target Cell Phone on T-Mobile's network or with
14  such other reference points as may be reasonably available.
15       106.    When using a cellular connection to receive or transmit data, a cellular
16  phone typically utilizes a cell tower to make telephone calls, send or receive text
17  messages, send or receive emails, surf the internet, carry out application initiated data
18  transfers, among other things.
19       107.    Based on my training and experience, I know that T-Mobile can collect
20  cell-site data about the Target Cell Phone. Based on my training and experience, I know
21  that for each communication (including data connections) a cellular device makes, its
22  wireless service provider can typically determine: (1) the date and time of the
23  communication; (2) the telephone numbers involved, if any; (3) the cell tower to which
24  the customer connected at the beginning of the communication; (4) the cell tower to
25  which the customer connected at the end of the communication; and (5) the duration of
26  the communication. I also know that wireless providers such as T-Mobile typically
27  collect and retain cell-site data pertaining to cellular devices to which they provide
28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 48
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  service in their normal course of business in order to use this information for various

2  business-related purposes.

3      108.   Different service providers use different systems, applications, and reports

4  to collect or analyze cell site data. These systems, applications, and reports are referred

5  to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon),

6  Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD"

7  (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE,

8  Timing Advance, and TruCall. RTT data, for example, estimates the approximate

9  distance of the cellular device from a cellular tower based upon the speed with which

10  signals travel between the device and the tower. This information can be used to estimate

11  an approximate location range that is more precise than typical cell-site data.

12      109.   Based on my training and experience, I know that wireless providers such

13  as T-Mobile and Verizon typically collect and retain information about their subscribers

14  in their normal course of business. This information can include basic personal

15  information about the subscriber, such as name and address, and the method(s) of

16  payment (such as credit card account number) provided by the subscriber to pay for

17  wireless communication service. I also know that wireless providers such as T-Mobile

18  and Verizon typically collect and retain information about their subscribers' use of the

19  wireless service, such as records about calls or other communications sent or received by

20  a particular device and other transactional records, in their normal course of business. In

21  my training and experience, this information may constitute evidence of the crimes under

22  investigation because the information can be used to identify the Target Cell Phone's user

23  or users and may assist in the identification of co-conspirators and/or victims.

24      110.   Modern cell phones allow users to switch their telephone numbers, use

25  multiple telephone numbers on a single device, and transfer their telephone number to a

26  different cell phone. These changes can be made with the assistance of the wireless

27  provider or by taking actions such as changing the "SIM card" (short for "subscriber

28  identity module card") of a cellphone. To provide for any such changes made to the

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 49
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Target Cell Phone, Attachment A specifies that the property to be searched includes:

2   (i) any instrument to which the listed target telephone number was assigned within the

3   last 30 days, and that now has been assigned a changed telephone number, (ii) any

4   changed telephone number assigned to an instrument now bearing the same unique

5   identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number

6   listed above, or that was bearing the same unique identifying number as the telephone

7   number listed above, at any point within the last 30 days, (iii) any changed unique

8   identifying number subsequently assigned to the same telephone number, or (iv) any

9   additional changed telephone number and/or unique identifying number, whether the

10  changes occur consecutively or simultaneously, listed to the same subscriber and wireless

11  telephone account number as the telephone numbers listed above, within the period of

12  disclosure authorized by this warrant.

13      **V.    AUTHORIZATION REQUEST FOR TT4, TT5, AND TT6**

14      111.    Based on the fact set forth in this affidavit, there is probable cause to

15  conclude that violations of 21 U.S.C §841 and §846 (distribution of controlled substances

16  and conspiracy to distribute controlled substances) have been committed, are being

17  committed, and will be committed by Jose Luis IBARRA VALLE, Jesus GARNICA

18  MELGOZA, PAISA, and others who are known and unknown.  The requested

19  information, including prospective location information, for **TARGET TELEPHONE 4,**

20  **TARGET TELEPHONE 5,** and **TARGET TELPHONE 6,** will help law enforcement

21  monitor the users of these Target Telephones, follow their movements when they are at

22  locations that are otherwise hard for law enforcement to observe, and identify other

23  coconspirators, sources of supply, storage locations, and other people and places of

24  evidentiary value.  There is probable cause to believe that the use of the investigative

25  technique described by the warrant will result in officers learning that identifying

26  information.

27      112.    Based on the foregoing, I request that the Court issue the proposed search

28  warrant and pen-trap order for the Target Telephones, i.e., **TARGET TELEPHONE 4,**

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 50
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **TARGET TELEPHONE 5,** and **TARGET TELEPHONE 6,** pursuant to Federal Rule
2  of Criminal Procedure 41, 18 U.S.C. § 2703(c), and  18 U.S.C. § 3123.

3       113.   I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of
4  Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to
5  delay notice to the subscriber or user of the Target Cell Phone until 90 days after the
6  collection authorized by the warrant has been completed.  There is reasonable cause to
7  believe that providing immediate notification of the warrant may have an adverse result,
8  as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of
9  the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a
10  disclosure would give that person an opportunity to destroy evidence, change patterns of
11  behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).
12  As further specified in Attachment B, which is incorporated into the warrant, the
13  proposed search warrant does not authorize the seizure of any tangible property.  *See* 18
14  U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of
15  any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire
16  or electronic information, there is reasonable necessity for the seizure for the reasons set
17  forth above.  *See* 18 U.S.C. § 3103a(b)(2).

18       114.   I further request that the Court direct T-Mobile to disclose to the
19  government any information described in Attachment B that is within the possession,
20  custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish
21  the government all information, facilities, and technical assistance necessary to
22  accomplish the collection of the information described in Attachment B unobtrusively
23  and with a minimum of interference with T-Mobile's services, including by initiating a
24  signal to determine the location of the Target Telephones on T-Mobile's network or with
25  such other reference points as may be reasonably available, and at such intervals and
26  times directed by the government.  The agency shall reasonably compensate T-Mobile for
27  reasonable expenses incurred in furnishing such facilities or assistance.

28

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 51
USAO #2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

115.   Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on T-Mobile.  Because the warrant will be served on T-Mobile, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.  I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Ryan Smith, Affiant
Special Agent
Drug Enforcement Administration


The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on 11th day of June, 2020.


PAULA McCANDLIS
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT RYAN SMITH - 52
USAO #2020R00259

**ATTACHMENT A**

**Property to Be Searched and Subscriber/Subject Information**

1. Records and information associated with the cellular phone assigned call number (206) 880-4341, with listed subscriber "Jose Luis VALLE IBARRA" with an address of "19065 21st Ave NE, Lake Forest Park, Washington, 98155-2401," hereinafter referred to as **Target Telephone 4**, whose service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. Investigators believe that **Target Telephone 4** is being used by Jose Luis IBARRA VALLE, who is a subject of the criminal investigation.

2. Records and information associated with the cellular phone assigned call number (425) 328-5534, with listed subscriber "Jesus Granica" with an address of "2118 168th Street SE, Bothell, Washington, 98012-6056," hereinafter referred to as **Target Telephone 5**, whose service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. Investigators believe that **Target Telephone 5** is being used by Jesus GARNICA MELGOZA, who is a subject of the criminal investigation.

3. Records and information associated with the cellular phone assigned call number (425) 626-8865, with no listed subscriber or address, hereinafter referred to as **Target Telephone 6**, whose service provider is T-Mobile, a company headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. Investigators believe that **Target Telephone 6** is being used by an individual using the name "Paisa," who is a subject of the criminal investigation.

4. The property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the

ATTACHMENT A -- PAGE 1
USAO # 2020R00259

1  last 30 days, (iii) any changed unique identifying number subsequently assigned to the

2  same telephone number, or (iv) any additional changed telephone number and/or unique

3  identifying number, whether the changes occur consecutively or simultaneously, listed to

4  the same subscriber and wireless telephone account number as the telephone numbers

5  listed above, within the period of disclosure authorized by this warrant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A -- PAGE 2
USAO # 2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127.  As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephones.  **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).**  Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below.  *See* 18 U.S.C. § 3103a(b)(2).

I.     **Section I:  Information to be Disclosed by T-Mobile**

1.     **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

       a.     Names (including subscriber names, user names, and screen names);

       b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

       c.     Local and long distance telephone connection records for 30 days;

       d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for 30 days;

       e.     Length of service (including start date) and types of service utilized;

       f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers

2  ("IMSI"), or International Mobile Equipment Identities ("IMEI");

3         g.     Other subscriber numbers or identities (including the registration

4  Internet Protocol ("IP") address); and

5         h.     Means and source of payment for such service (including any credit

6  card or bank account number) and billing records.

7      **2.**    **Pen Register/ Trap and Trace Data and Associated Subscriber Records**

  **to Be Provided for a Period of 45 Days.**

8

9         a.     T-Mobile shall install and monitor pen-trap devices to record,

10  decode, and/or capture dialing, routing, addressing, and signaling information associated

11  with each communication to or from the Target Telephones including the date, time, and

12  duration of the communication, and the following, without geographic limit and without

13  notice to the subscriber:

14      (i)    IP addresses associated with the cell phone device or devices used to send or

15              receive electronic communications;

16      (ii)   Any unique identifiers associated with the cell phone device or devices used

17              to make and receive calls with the cell phone number described in

18              Attachment A, or to send or receive other electronic communications,

19              including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

20      (iii)  IP addresses of any websites or other servers to which the cell phone device

21              or devices connected; and

22      (iv)  Source and destination telephone numbers and email addresses.

23         b.    On a 24-hour-a-day basis, for the duration of the authorized pen-trap

24  devices, T-Mobile shall provide the following records for those subscribers whose

25  identifiers are obtained pursuant to the use of the pen-trap devices:  published or non-

26  published subscriber names and addresses, including billing addresses.

27

28

ATTACHMENT B – PAGE 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   **3.      Historical Cell Cite Location Information.**

2          a.      All records and other information (**not including the contents of**

3   **communications**) relating to wire and electronic communications sent or received by the

4   Accounts from April 13, 2020, to June 11, 2020, including:

5                  i.      the date and time of the communication, the method of the

6   communication, and the source and destination of the communication (such as the source

7   and destination telephone numbers (call detail records), email addresses, and IP

8   addresses); and

9                  ii.     historical cell site information regarding the cell tower and

10  antenna face (also known as "sectors") through which the communications were sent and

11  received.  This information is to be provided irrespective of the application, name, or

12  report utilized by T-Mobile.  Accordingly, this information includes the following data

13  sets to the extent that they are collected by T-Mobile: RTT, PLU, PCMD, NELOS,

14  EVDO, TruCall, ALULTE, and Timing Advance.

15         b.      The physical address and coverage maps of cell towers used by the

16  Target Telephones.

17  **1.      Prospective Cell Site Location Information.**

18         a.      All information about the location of the Target Telephones

19  described in Attachment A for **a period of 45**, during all times of day and night.  This

20  information includes: precise location information, as well as all data about which "cell

21  towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces

22  of the towers) received a radio signal from the cellular telephones or accounts described

23  in Attachment A.

24         b.      The physical address and coverage maps of cell towers used by the

25  Target Telephones.

26

27  **2.      Prospective E-911/GPS and Cell Site Triangulation Information.**

28         a.      All information about the location of the Target Telephones

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

described in Attachment A for **a period of 45 days**, during all times of day and night. This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones or accounts described in Attachment A.

        b.    The physical address and coverage maps of cell towers used by the Target Telephones.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government pursuant to this warrant. In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

**II.**    **Section II: Information to Be Seized by the Government**

    1.    All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841 and 846, involving Jose Luis IBARRA VALLE, Jesus GARNICA MELGOZA, and/or Paisa.

    2.    All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

    3.    All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

    4.    Location Information regarding the Target Cell Phone.

ATTACHMENT B -- PAGE 4
USAO # 2020R00259

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      Law enforcement personnel (who may include, in addition to law enforcement

2  officers and agents, attorneys for the government, attorney support staff, agency

3  personnel assisting the government in this investigation, and outside technical experts

4  under government control) are authorized to review the records produced by the T-

5  Mobile in order to locate the things particularly described in this Warrant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT B – PAGE 5
USAO # 2020R00259